**FILED**
**Mar 27, 2024**
**02:43 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT NASHVILLE

| | | |
|---|---|---|
| **BRANDY DAWSON,** | ) | **Docket No. 2021-06-0210** |
| **Employee,** | ) | |
| **v.** | ) | |
| **OPTUM SERVICES, INC.,** | ) | **State File No. 45004-2019** |
| **Employer,** | ) | |
| **And** | ) | |
| **STANDARD FIRE INS. CO.,** | ) | **Judge Joshua D. Baker** |
| **Carrier.** | ) | |

---

### EXPEDITED HEARING ORDER GRANTING BENEFITS

---

Ms. Dawson asked the Court to order medical treatment for thoracic outlet syndrome with vascular surgeon Dr. Robert Thompson, past and ongoing temporary disability benefits, and attorney's fees. Optum denied the request, asserting the alleged thoracic outlet syndrome did not arise out of her employment.

For the reasons below, the Court holds Ms. Dawson is entitled to medical treatment with Dr. Thompson, past and ongoing temporary disability benefits, and attorney's fees on the temporary disability benefits.

### Claim History

Ms. Dawson worked for Optum as a nurse, visiting patients at their homes. In June 2019, while walking up a driveway, she "fell forward and landed on her outstretched hands/wrists[.]"

Optum accepted her claim and authorized treatment with several physicians for various injuries. Yet a few months into her care, her authorized doctors struggled to explain—or sometimes dismissed—upper extremity symptoms unexplained by diagnostic imaging.

1

Ms. Dawson complained of pain radiating from her neck and shoulder into the arms and down to the fingers, right-arm muscle weakness, numbness and tingling, right-hand coldness and finger discoloration, difficulty raising her right arm overhead, and paresthesia in her right hand.

Dr. Lucas Richie, the orthopedic surgeon treating Ms. Dawson's right shoulder, recommended a neurologist and a spine surgeon, and he ordered physical therapy.

Four months post-injury, a physical therapist observed discoloration and coldness in Ms. Dawson's right hand and fingers and considered her symptoms "suggestive of thoracic outlet syndrome[,]" which can occur when nerves become compressed after a physical trauma. Dr. Richie kept her in physical therapy "for continued strengthening and treatment of potential thoracic outlet syndrome."

Meanwhile, Dr. Richie's referrals to a neurosurgeon and spine surgeon did not yield any diagnosis that would explain Ms. Dawson's symptoms. Dr. Christopher Kauffman, a spine surgeon, had little to offer and released her. Neurosurgeon Dr. Margaret MacGregor then treated her for two years but also could not explain her symptoms. Neither doctor diagnosed thoracic outlet syndrome.

Nearly two years post-injury, Ms. Dawson returned to Dr. Richie with "continued complaints of generalized right arm and shoulder pain" and complained that "Dr. MacGregor does not treat thoracic outlet." So on March 19, 2021, Dr. Richie referred Ms. Dawson "to a brachial plexus specialist [for] further definitive evaluation [and] management of any potential nerve entrapment[,] which [I'm] not well versed in[,] and they can assume care for this."

Ms. Dawson testified Optum never offered a panel of brachial plexus specialists. Instead, it questioned the appropriateness of Dr. Richie's referral, sending him a questionnaire. He responded:

> [A]n abnormality of the brachial plexus . . . is a rare diagnosis that I do not treat. There are few physicians that treat such a disorder[,] and if there is concern of this[,] it would likely require evaluation by a specialist in brachial plexopathy and not an orthopedic spine (Dr. Kauffman) or neurosurgeon (Dr. MacGregor) specialist.

While the syndrome's rarity made it seem "unlikely," he said, "I do not treat these types of disorders[,] and I could be wrong."

Despite Dr. Richie's direct statement on the recommended course of care, Optum did not offer treatment from a specialist. So Ms. Dawson consulted Dr. Thomas Naslund, a vascular surgeon, on her own.

Dr. Naslund diagnosed neurogenic thoracic outlet syndrome, a specific type of thoracic outlet syndrome caused by compression of the brachial plexus nerves, and he recommended surgery. Dr. Naslund balked over determining causation "to a reasonable degree of medical certainty" because he only examined her once. He wrote in a questionnaire response, "I cannot make that level of certainty. [She] provided verbal history indicating job injury caused chronic pain. My opinion of thoracic outlet syndrome is not proven. Only success with surgery would prove this." He also thought surgery was not medically necessary if "tolerating symptoms as an alternative is reasonable."

After Dr. Naslund diagnosed thoracic outlet syndrome, Drs. Kauffman and MacGregor weighed in on his opinion. Dr. Kauffman wrote, "I do not think there is any relationship between the slip and fall at work and thoracic outlet syndrome." Specifically, he mentioned the lack of any cervical-rib abnormality on an MRI. For her part, Dr. MacGregor wrote, "I do not feel that the patient has thoracic outlet syndrome, nor do I feel that she has CRPS [Complex Regional Pain Syndrome] of the right upper extremity."

Dr. Richie, however, did not place Ms. Dawson at maximum medical improvement and continued to insist she needed an evaluation by a specialist who treats thoracic outlet syndrome:

> I did not place her at MMI. I am unable to find etiology responsible for her significant ongoing pain[.] . . . I do not treat or diagnose thoracic outlet. I cannot state whether this may be related to her injury[.] . . . For my diagnosis of shoulder pain[,] I do not anticipate the need for further care. However, a physician treating thoracic outlet may have [a] different opinion.

By December 2021, all the doctors treating Ms. Dawson had released her. So Ms. Dawson searched for an expert to treat her for thoracic outlet syndrome.

She found Dr. Robert Thompson, a board-certified vascular surgeon and brachial plexus specialist, with "uncommon" expertise in thoracic outlet. Dr. Thompson had focused his practice solely on the syndrome for 15 years and was also the director of a multidisciplinary center for thoracic outlet. He performed roughly 300 surgeries per year on only thoracic outlet cases. As he said, "That's all I do."

In his July 2022 written report, Dr. Thompson diagnosed Ms. Dawson with neurogenic thoracic outlet syndrome, just like Dr. Naslund. However, he also related it to her work accident and recommended surgery. He explained the surgery is medically reasonable and necessary, and he said that she cannot work until she receives it.

3

Three months after Dr. Thompson gave that opinion, Optum filed a Notice of Denial, asserting "[e]mployment did not contribute over 50% in causing thoracic outlet syndrome."

Optum continued medical treatment for Ms. Dawson's accepted injuries, and she presently sees Dr. Michael Hillegass, a physiatrist. However, she maintains her desire to treat her thoracic outlet syndrome through workers' compensation, describing her symptoms as intolerable and an interference with her daily living activities and her ability to work.

During discovery, the parties deposed four physicians: two authorized physicians, Drs. MacGregor and Hillegass; and Ms. Dawson's two experts, vascular surgeons Drs. Naslund and Thompson. Their deposition testimony is summarized below.

### Dr. MacGregor, authorized neurosurgeon

In her deposition, Dr. MacGregor declined to give any opinion about thoracic outlet syndrome, saying, "I don't have an opinion." She sees "less than one percent" of patients with thoracic outlet syndrome and does not treat it. She deferred to the vascular surgeons on the diagnosis, its recommended treatment, the maximum recovery date for that condition, permanent impairment, and causation.

Dr. MacGregor explained her comments in medical records, saying that at the time she treated Ms. Dawson, she discounted the syndrome because "although trauma can cause that, I didn't think her symptoms best matched that." Also, "other conditions can mimic thoracic outlet syndrome, or [it] can mimic those conditions."

### Dr. Hillegass, authorized physiatrist

Dr. Hillegass does not diagnose thoracic outlet syndrome but co-treats it with a surgical specialist, usually a vascular surgeon. He deferred to the vascular surgeons on Ms. Dawson's diagnosis and its cause. When asked if he has any uncertainty about her diagnosis, he responded, "No[.] . . . She's seen two vascular surgeons who have similar assessments and similar treatment recommendations. I would not go against those opinions from those experts."

Dr. Hillegass does not think Ms. Dawson is at maximum recovery because "she still [has] significant pain and functional impairment involving the right upper extremity[.]" About her ability to work, he pointed out she has reported disabling symptoms that have not been treated. While a functional capacity evaluation "is the most objective measure of her function[,]" he said, if thoracic outlet "has not been treated sufficiently, it's reasonable to state that [thoracic outlet] has limited her ability to work."

4

*Dr. Naslund, vascular surgeon*

Dr. Naslund testified he sees patients with thoracic outlet four to six times a week and operates on it about 70 times per year. While he could not remember Ms. Dawson, he confirmed his signature on the questionnaire response he signed shortly after he diagnosed her with the condition.

As with his questionnaire response, Dr. Naslund equivocated over answers requiring a reasonable degree of medical certainty, possibly misunderstanding the standard required. He mentioned the "subjectivity" of diagnosing and said, "I can't prove [its] presence[.] . . . I can't tell you . . . that I have certainty." But "she probably has it."

Likewise, Dr. Naslund would not express "certainty" about causation. He said, "I have no way to know that [the work fall] was an event." Additionally, he expressed discomfort over his unfamiliarity with her claim. He explained, "If I'm going down that pathway to try to find out if this is the only event that could result in thoracic outlet syndrome, then I'd have to have every clinical record she's ever had[.] . . . That's far larger than any scope of evaluation I was involved with."

As for surgery, Dr. Naslund thought it is only reasonable and necessary if she finds her symptoms unbearable. Ultimately though, he deferred to Dr. Thompson's opinion on Ms. Dawson's claim, saying, "I'm not trying to [give] an opinion. I'm not qualified, and I haven't researched it enough on my own to provide any such similar opinion."

*Dr. Thompson, vascular surgeon*

Dr. Thompson, who treats only thoracic outlet syndrome, said he is a brachial plexus specialist. Like Dr. Naslund, he diagnosed Ms. Dawson with neurogenic thoracic outlet syndrome, which is "caused by compression of the brachial plexus nerves." Also, like Dr. Naslund, he said a cervical-rib abnormality on an MRI "would not be expected and, certainly, never thought to be necessary for [a thoracic outlet] diagnosis."

Dr. Thompson strongly disagreed with Dr. Naslund's comment that thoracic outlet syndrome can only be proven with a successful surgery, calling it "backwards." He said, "The diagnosis is established on clinical criteria. I don't know of any medical reason why one would say that the diagnosis is not proven except with successful surgery." Rather, he said her diagnosis derived from "her symptoms, the previous evaluations, and testing that she had done that helped to exclude other potential conditions, [a] physical examination, and also the standard diagnostic criteria." She "unequivocally had the diagnosis. It was a very strong diagnosis. Her condition was disabling." He agreed that the symptoms Ms. Dawson reported early in her claim were typical, characteristic of, or consistent with thoracic outlet syndrome.

Further, Dr. Thompson related the diagnosis to her work injury, calling her fall "the direct and immediate cause of her development [of] neurogenic thoracic outlet syndrome." Falling from a standing height onto an outstretched arm is "a typical mechanism of injury" for this syndrome.

The fall is "the trigger," he said. But "the development of the condition is an evolving one where the nerve compression and irritation increased over time. After the specific incident . . . it was an evolution of over weeks to months after that, that the full spectrum of symptoms evolved."

Dr. Thompson said Ms. Dawson is not at maximum recovery because "she has a very sound and solid clinical diagnosis of neurogenic TOS for which she has not yet received appropriate recommended treatment." Further, she has a disabling condition and "need[s] to be out of work [due to] the thoracic outlet syndrome that arose as a result of the work-related injury."

Regarding treatment recommendations, Dr. Thompson did not think physical therapy was "likely to have a major impact, given the duration and extent of her symptoms and her previous attempts at treatment." Instead, he recommended surgery.

**Findings of Fact and Conclusions of Law**

Ms. Dawson must prove she is likely to prevail at a final hearing on her requested benefits. Tenn. Code Ann. § 50-6-239(d)(1) (2023); *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Mar. 27, 2015). She seeks medical treatment, temporary disability benefits, and attorney's fees on an award of temporary disability benefits and for the wrongful denial of treatment.

*Medical Causation*

The threshold question is whether Ms. Dawson's diagnosis of thoracic outlet syndrome is related to her work accident.

An injury is work-related if it "arises primarily out of and in the course and scope of employment," resulting in "disablement or the need for medical treatment." Tenn. Code Ann. § 50-6-102(12). An employee must show "to a reasonable degree of medical certainty that [the work incident] contributed more than fifty percent (50%) in causing the . . . disablement or need for medical treatment, considering all causes." This requires expert opinion that it is more likely than not, considering all causes, as opposed to speculation or possibility. *Id.* at -102(12)(A)-(D).

Here, Dr. Thompson, a renowned expert focusing solely on this syndrome, concluded to a reasonable degree of medical certainty that Ms. Dawson's work injury is

"the direct and immediate cause of her development [of] neurogenic thoracic outlet syndrome."

Optum did not produce a competing or compelling opinion from any qualified expert to refute that testimony, as all the deposed experts deferred to Dr. Thompson.

While Optum relied on Dr. Naslund's uncertainty, that reliance is misplaced. His uncertainty derived not from thoughtful and deliberate consideration of all potential causes but from his unfamiliarity with Ms. Dawson's claim, a seeming misunderstanding of the level of certainty required, and just a general reluctance to answer. As he testified, "I'm not trying to make an opinion."

Also, Dr. Thompson's deposition testimony overcomes any presumption of correctness afforded to notations made in passing by Drs. MacGregor and Kauffman. Tenn. Code Ann. 50-6-102(12)(E). In fact, since her notation, Dr. MacGregor testified under oath that she has no opinion. Further, she specifically deferred to the vascular surgeons.

And unlike Dr. Thompson's testimony, Dr. Kauffman's notation was not sworn or subject to cross-examination, and it lacked any compelling authority or explanation. Rather, his observation that Ms. Dawson did not have the syndrome because her MRI did not show a cervical-rib abnormality highlights how Ms. Dawson needed an evaluation from a vascular surgeon rather than a spine surgeon. Both vascular surgeons testified that his observation was meaningless, as that abnormality appears in only a minority of patients with the syndrome.

Notably, as Dr. Richie suggested in his April 2021 response to Optum to explain his referral, neither Dr. Kauffman nor Dr. MacGregor has sufficient expertise—like a vascular surgeon—to diagnose, evaluate, or treat thoracic outlet syndrome.

For these reasons, the Court accepts Dr. Thompson's opinion and concludes Ms. Dawson is likely to prevail in proving that her thoracic outlet syndrome is work-related.

*Medical Benefits*

Because an employer is required to furnish reasonable and necessary treatment for a work-related condition, the Court holds Ms. Dawson is entitled to medical benefits for thoracic outlet syndrome. Tenn. Code Ann. § 50-6-204.

Dr. Thompson believes surgical treatment for Ms. Dawson is necessary and reasonable to treat her work injury, so the question is not which treatment must be furnished, but instead, who should treat her.

Ms. Dawson contends Dr. Thompson should become her authorized physician. Optum disagrees that her need for treatment of thoracic outlet syndrome is not related to her work. However, if the Court finds a causal relationship exists, it should be allowed to offer a panel.

The statute contemplates, even directs, that authorized physicians must make referrals where appropriate. Section 50-6-204(a)(3)(A)(ii) reads, "When necessary, the treating physician selected in accordance with this subdivision (a)(3)(A) shall make referrals to a specialist physician, surgeon, or chiropractor."

Optum argued not providing a panel at the time was justified "based on the opinions of the authorized medical providers." It suggested that an examination by a vascular surgeon was unnecessary since authorized doctors could not diagnose or relate thoracic outlet syndrome to Ms. Dawson's work fall.

However, Dr. Richie, an authorized physician, explicitly referred Ms. Dawson to a brachial plexus specialist or vascular surgeon because he did not have sufficient expertise to treat symptoms involving her brachial plexus. However, Optum disregarded Dr. Richie's referral.

When questioned about the referral, Dr. Richie's answer demonstrated why it was incumbent upon Optum to offer a panel of specialists. While he thought thoracic outlet "unlikely," he pointed out that his and other doctors' opinions did not matter because it is a "rare diagnosis" that none of them treats and "require[s] evaluation by a specialist in brachial plexopathy and not an orthopedic spine (Dr. Kauffman) or neurosurgeon (Dr. MacGregor) specialist."

In other words, the referral was necessary to evaluate and treat Ms. Dawson's unexplained symptoms in her right upper extremity, as none of her authorized providers (two orthopedists, a spine surgeon, and a neurosurgeon) can diagnose or treat thoracic outlet.

An injured worker is not required to prove her diagnosis, or even medical causation, to obtain examination where she has expressed a need for medical care after a work injury, especially when an authorized physician has also expressed that her documented symptoms require evaluation from a specialist. "An employer's assertion that an employee has no medical evidence supporting his or her claim does not, standing alone, excuse it from [its] statutory obligations under section 50-6-204(a)(1)(A)." *Hawes v. McLane Co., Inc.*, 2021 TN Wrk. Comp. App. Bd. LEXIS 30, at *9-10 (Aug. 25, 2021).

Based on Dr. Richie's referral alone, Optum should have offered a panel of specialists. Although Dr. Naslund's reluctance or inability to answer medical causation questions with the degree of certainty required of him might have muddied the waters,

8

Optum filed its Notice of Denial three months after Dr. Thompson's written report plainly related Ms. Dawson's need for treatment of thoracic outlet syndrome to her work accident. Therefore, Optum had the opportunity to offer a panel of specialists but declined to do so.

"An employer who elects to deny a claim runs the risk that it will be held responsible for medical benefits obtained from a medical provider of the employee's choice[.]" *Barrett v. Lithko Contracting*, 2016 TN Wrk. Comp. App. Bd. LEXIS 93, at *8 (Dec. 8, 2016). Optum denied Ms. Dawson a panel forcing her to establish a relationship with Dr. Thompson out of necessity. The Court declines to sever that bond and appoints Dr. Thompson as the authorized physician for Ms. Dawson's thoracic outlet syndrome.

*Temporary Disability Benefits*

Ms. Dawson seeks temporary total disability benefits beginning February 14, 2022, when Optum ended temporary disability benefits for her other work-related injuries.

To qualify, "an employee must establish: (1) that he or she became disabled from working due to a compensable injury; (2) that there is a causal connection between the injury and the inability to work; and (3) the duration of the period of disability." *Smith v. Trustpoint Hosp., LLC,* 2021 TN Wrk. Comp. App. Bd. LEXIS 1, at *21-22 (Jan. 6, 2021).

Applying this framework, the Court finds that Ms. Dawson is disabled from working due to thoracic outlet syndrome causally related to her fall at work. Dr. Thompson testified that Ms. Dawson is not at maximum recovery because she has not had surgery, she has a disabling condition, and her "need to be out of work" is "the result of the thoracic outlet syndrome that arose as a result of the work-related injury." Ms. Dawson also testified that her symptoms from thoracic outlet syndrome prevent her from working.

The Court holds Ms. Dawson is likely to prevail at a final hearing on an award of temporary disability benefits from February 14 through the date of the hearing, which is 107 weeks and three days, and ongoing. Her compensation rate is $1,021.90 per week, or $145.99 per day, so $109,343.30 (107 weeks x $1,021.90) plus $437.97 (3 days x $145.99) totals $109,781.27 that Optum must pay in temporary total disability benefits and ongoing at $1,021.90 per week until Ms. Dawson reaches maximum recovery or is able to work.

As for attorney's fees, the Court will not rule on Ms. Dawson's request for them under section 50-6-226(d)(1) at this time. *See Thompson v. Comcast Corp.,* 2018 TN Wrk. Comp. App. Bd. LEXIS 1, at *29 (Jan. 30, 2018) (A decision to award attorney's fees and expenses at an interlocutory stage of a case should be made only in extremely limited circumstances).  Ms. Dawson may raise this issue at the compensation hearing.

**IT IS, THEREFORE, ORDERED:**

1. Optum shall pay past temporary total disability benefits in a lump sum totaling $109,781.27 from February 14, 2022, through the date of the expedited hearing. Additionally, Optum must pay weekly benefits in the amount of $1,021.90 until Ms. Dawson reaches maximum medical improvement or is able to return to work. Ms. Dawson's counsel is entitled to 20% of these awards as attorney's fees.

2. Optum shall furnish additional treatment with Dr. Thompson as the authorized treating physician.

3. The Court defers ruling on Ms. Dawson's request for attorney's fees under Tennessee Code Annotated section 50-6-221(d)(1).

4. A status hearing is set for **May 20, 2024, at 10:00 a.m. Central Time.** You must call 615-741-2113 or 855-874-0474 to participate.

5. Unless interlocutory appeal of this Expedited Hearing Order is filed, compliance with this order must occur by seven business days of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3). The Insurer or Self-Insured Employer must submit confirmation of compliance by email to WCCompliance.Program@tn.gov by the compliance deadline. Failure to do so may result in a penalty assessment for non-compliance.

6. For compliance questions, please contact the Workers' Compensation Compliance Unit by email at WCCompliance.Program@tn.gov.

**ENTERED March 27, 2024.**

_____

**JUDGE JOSHUA D. BAKER**
**Court of Workers' Compensation Claims**

10

**Appendix**

Technical Record:

1. Petition for Benefit Determination filed August 29, 2022, by Employee
2. Petition for Benefit Determination filed October 28, 2022, by Employer
3. Dispute Certification Notice
4. Employer's Request for Scheduling Hearing
5. Employee's Request for Expedited Hearing
6. Employee's Motion to Continue
7. Employer's Response to Motion to Continue
8. Employee's Reply to Employer's Response to Motion to Continue
9. Order Granting Motion to Continue entered May 16, 2023
10. Order Setting Status Conference
11. Order Setting Expedited Hearing
12. Notice of Substitution of Counsel
13. Employer's Motion for Continuance
14. Employee's Response to Motion for Continuance
15. Order Granting Motion to Continue entered January 9, 2024
16. Notice of Stipulations


Exhibits:

1. Medical records, joint filing
2. Rule 72 Declaration of Ms. Dawson
3. Deposition of Dr. Thompson
4. Deposition of Dr. Naslund
5. Deposition of Dr. MacGregor
6. Deposition of Dr. Hillegass
7. Notice of Denial

## CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on March 27, 2024.

| Name | Certified Mail | Regular Mail | Email | Sent to |
|------|----------------|--------------|-------|---------|
| Julie Reasonover, Employee's attorney | | | X | julie@reasonoverlaw.com |
| Leslie Bishop, Employer's attorney | | | X | lbishop@lewisthomason.com rlee@lewisthomason.com |

_____/Penny Shrum/_____

**Penny Shrum**
**Clerk, Court of Workers' Compensation Claims**
WC.CourtClerk@tn.gov

12



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board.  To do so, you must:

1.  Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.

    ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.

    ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.

    When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2.  You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal.  Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service.  In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee.  You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal.  **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3.  You are responsible for ensuring a complete record is presented on appeal.  If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee.  If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk.  The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted.  For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4.  After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

    **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable.  See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury: _____**

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____ ☐ Motion Order filed on _____

☐ Compensation Order filed on_____ ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*